**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| BRANDON LIVAS, RICHARD BUSWELL, DEWAYNE CORBETT, JOHNNY SMITH, CARLOS LORENZO MARTIN, and GAINES ANDREWS, on behalf of themselves and those similarly situated, <br><br> *Petitioners*, <br><br>   v. <br><br> RODNEY MYERS, warden of Oakdale Federal Correctional Institutions; and MICHAEL CARVAJAL, Federal Bureau of Prisons Director, in their official capacities, <br><br> *Respondents*. | Case No. xx-cv--- <br><br> **Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief** <br><br> **Class Action** <br><br><br> **IMMEDIATE RELIEF SOUGHT** |

## INTRODUCTION

1.  You are likely reading this Petition from self-isolation in your home. Now imagine if someone sick with COVID-19 came into your home and sealed the doors and windows behind them. That is what the Oakdale federal detention centers[1] have just done to the over 1,800 human beings currently detained there, where a COVID-19 outbreak is rampant, social distancing is impossible, and no one detained can leave.

---

[1] The Oakdale complex consists of FCI Oakdale I (population about 917) and FCI Oakdale II (population about 900, including 760 at the prison and 140 at the "Camp"). Conditions vary slightly among these buildings. *See* https://www.bop.gov/locations/institutions/oak/; https://www.bop.gov/locations/institutions/oad/. Because Defendant Myers is Warden for both, Defendant Carvajal is responsible for prisoners at both, and, upon information and belief, both facilities are infected with COVID-19, they are referred to collectively as "Oakdale."

2.      We are in the midst of the most significant pandemic in generations.[2] A highly contagious and deadly virus called coronavirus has swept the globe. No one is safe. The lethality rate of COVID-19, the serious respiratory disease caused by this coronavirus, is estimated between 0.3% and 3.5%: at least 5-35 times deadlier than the common flu that kills thousands a year.[3] All age groups, including some children, have contracted the disease,[4] and the World Health Organization estimates that one in five people who do contract it require hospitalization.[5] On March 13, 2020, President Trump declared a national state of emergency.[6] As of March 26, 2020, the United States led the world in confirmed cases of COVID-19.[7] The virus is spreading exponentially: U.S cases doubled in the five-day period prior to April 2nd.[8]

3.      COVID-19 is currently running rampant in the state of Louisiana.  A study from the University of Louisiana at Lafayette reported that COVID-19 cases grew at 67.8% in the first

---

[2] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[3] Exhibit 1, Declaration of Joe Goldenson, MD ("Goldenson Dec.") ¶7. As of April 52, 2020, there were 1,260015,104403 confirmed cases globally, with 6853,030413 deaths and 25810,588579 recoveries. Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U.

[4] Robert Verity, PhD., et al., *Estimates of the Severity of Coronavirus Disease 2019: A Model-Based Analysis*, Lancet Infec Dis (March 30, 2020), 6.

[5] World Health Organization, *Q&A on Coronaviruses (COVID-19)*, *"Should I Worry About COVID-19?,"* https://cutt.ly/YtEyrxl.

[6] Derek Hawkins et al., *Trump Declares Coronavirus Outbreak a National Emergency*, Wash. Post (March 13, 2020, 10:46 AM), https://cutt.ly/ftWyIPb.

[7] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, New York Times (March 26, 2020), https://cutt.ly/QtQ7zz6.

[8] Soo Kim, U.S. Coronavirus Cases Doubled in Just Five Days as Daily Death Toll Increasingly Exponentially, Newsweek (April 2, 2020), *available at* https://www.newsweek.com/coronavirus-update-america-cases-double-1495692; Johns Hopkins University, Coronavirus Resource Center, *available at* https://coronavirus.jhu.edu/map.html; *see also* Brittany Shammas, et al., *Trump says Quarantine for New York Area "Will not be Necessary;" U.S. Coronavirus-related Deaths Double in Two Days*, Wash. Post (March 28, 2020, 11:27 p.m.), https://cutt.ly/ktRo8u0.

two weeks after the initial diagnosis, the highest rate in the United States.[9] As of April 2, 2020, Louisiana had 9,150 confirmed cases of COVID-19, with at least 310 deaths.[10]  On April 2, 2020, Louisiana Governor John Bel Edwards extended the state's stay-at-home order to April 30th, limiting gatherings in confined spaces to 10 or fewer people.[11]  Governor Edwards estimated that the state would exceed its ventilator capacity by April 9th, and its ICU capacity a few days after that.[12]

4.      There is no vaccine or cure for COVID-19. The best course, according to public health experts, is to slow and prevent transmission, primarily through a practice known as "social distancing."[13] Social distancing requires all people to stay at least six feet away from all other people to control the spread of the virus. These measures are particularly important because the coronavirus spreads aggressively, and people can spread it even if they do not feel sick or exhibit any symptoms.[14] The only assured way to curb the pandemic is through dramatically reducing

---

[9] Adam Daigle, *Coronavirus Cases Grew Faster in Louisiana Than Anywhere Else in the World: UL Study*, THE ACADIANA ADVOCATE (Mar. 24, 2020), *available at* https://www.theadvocate.com/acadiana/news/coronavirus/article_94494420-6d4b-11ea-ac42-ff7dd722c084.html.

[10] Sunday, April 3rd's figures represent a nearly 143% increase of confirmed cases since Friday, April 2 and a nearly 154% increase in confirmed deaths since Friday April, 2. *See* Louisiana Department of Health, Office of Public Health, Louisiana Coronavirus (COVID-19) Information, *available at* http://ldh.la.gov/coronavirus.

[11] *Louisiana coronavirus stay-at-home order extending to April 30, John Bel Edwards announces,* NOLA.com (Apr. 2, 2020) *available at* https://cutt.ly/8tD5Kni; *see also* Victoria Christina, *Gov. Edwards: Without social distancing, data models show thousands of new hospitalizations daily*, WGNO.com (April 3, 2020) (Gov. Edwards encourages people to "understand the impact of" and "full[y] compl[y] with" social distancing), *available at* https://cutt.ly/ptD5Jr0.

[12] Chandelis Duster, Louisiana governor says state could run out of ventilators by end of the week if coronavirus cases continue to rise, CNN, (Apr. 5, 2020, 12:43 p.m.) available at: https://cutt.ly/WtD5Fu1.

[13] Goldenson Dec. ¶14; World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19.").").

[14] Centers for Disease Control and Prevention, *How Coronavirus Spreads*, https://cutt.ly/CtYRkkC.

contact for all.[15] Consequently, every American institution—from schools[16] to places of worship,[17] from businesses[18] to legislatures[19]—has been exhorted to reduce the number of people in close quarters, if not empty entirely.[20] They have also been told to undertake aggressive sanitation measures, such as cleaning and disinfecting all surfaces for exacting periods of time with products with particular alcohol contents, and closing off any areas used by a sick person.[21]

5.      These imperatives apply with special force to prisons, where the government controls almost entirely a person's ability to avoid others and to maintain adequate sanitation.

6.      Yet prisons are fundamentally incapable of implementing these recommendations, and incarcerated people are already dying nationwide as a result. For example, as of February 29, 2020, at the peak of the outbreak in Wuhan, China —the city where COVID-19 originated—over half of all new infection cases were incarcerated people.[22] On Rikers Island, the rate of infection among incarcerated people is over eight times the rate of infection in New York City generally,

---

[15] Harry Stevens, *Why Outbreaks Like Coronavirus Spread Exponentially, and how to "Flatten the Curve,"* Wash. Post. (March 14, 2020), https://cutt.ly/etYRnkz.

[16] Centers for Disease Control and Prevention, *Interim Guidance for Administrators of US K-12 Schools and Child Care Programs*, https://cutt.ly/ItRPq5n.

[17] Centers for Disease Control and Prevention, *Interim Guidance for Administrators and Leaders of Community-and Faith-Based Organizations to Plan, Prepare, and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/KtRPk1k.

[18] Centers for Disease Control and Prevention, *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, https://cutt.ly/stRPvg4.

[19] Nat'l Conf. of State Legislatures, *Coronavirus and State Legislatures in the News*, https://cutt.ly/4tRPQne.a

[20] As of April 3, 2020, fully 311 million Americans were being urged by their City, County, Parish, Territory, and/or State governments to stay at home to reduce the spread of coronavirus. See Sarah Mervosh, Denise Lu, Vanessa Swales, Which States and Cities Have Told Residents to Stay at Home, NEW YORK TIMES (last updated April 3, 2020), *available at*: https://cutt.ly/CtDMZY0.

[21] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility*, https://cutt.ly/atYE7F9.

[22] Zi Yang, Cracks in the System: COVID-19 in Chinese Prisons, THE DIPLOMAT (March 9, 2020), *available at* https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/.

and 45 times higher than the rate in Wuhan, China.[23] Fourteen prisoners have died of COVID-19 in Bucks County, Pennsylvania.[24] Three inmates have died of the disease at FSL Elkton, a federal prison near Youngstown, Ohio.[25]

7. Further, prisons are not sealed off from the world outside them. By their nature, people cycle in and out constantly—from correctional and medical staff, to families and attorneys, to those serving short sentences or finishing longer ones. This dynamic was occurring before BOP's lockdown, and possibly-infected-but-asymptomatic employees are still going home and returning to Oakdale even during the lockdown's pendency. This allows COVID-19 to spread from Oakdale to the community and from the community to Oakdale. Failing to prevent and mitigate the spread of COVID-19 endangers not only those within the institution, but the entire community. Hence, immediate and categorical release of prisoners, starting with the medically-vulnerable, is the primary mitigation effort that Oakdale can undertake to comport with public health guidance and to prevent a catastrophic outbreak at the facility.

8. Attorney General Barr's April 3rd Memorandum to Defendant Carvajal ("April 3 Memo") recognized the "significant level of infection" at Oakdale and suggested "immediately" "mov[ing] vulnerable inmates out."[26] However, the April 3 Memo did not define "vulnerable

---

[23] These numbers likely underestimate the infection rate on Rikers Island, as they do not include the number of people contracted COVID-19 on Rikers Island but who have already been released. The rates of infection rely on publicly released data collected by the Legal Aid Society. *See* LEGAL AID SOCIETY, *Analysis of COVID-19 Infection Rate in NYC Jails* (last visited April 5, 2020, 3:00 p.m.), *available at*: https://cutt.ly/RtYTbWd.

[24] Larry R. King, Bucks County COVID-19 Deaths Reach 14; Four Cases Confirmed at Prison (April 4, 2020), available at: https://cutt.ly/utD6u5F.

[25] Rachel Polansky, 3 inmates at eastern Ohio prison dead from suspected cases of COVID-19, WKYC (April 4, 2020, 11:18 p.m.), available at: https://cutt.ly/7tD6wlA.

[26] Memorandum from Attorney General William Barr to Director of Bureau of Prisons, The Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (April 3, 2020), *available at* https://politi.co/2UV3JBi.

inmates."[27] Nor did it establish concrete timelines and guidelines for local officials, including Defendants, to implement this directive in line with public health expertise—even though Oakdale is a low-security facility, and therefore every prisoner has already been deemed low risk. Finally, the April 3 Memo did not establish accountability mechanisms for the suffering, death, and constitutional violations to date. This lawsuit seeks all of the above.

9.      Everyone at Oakdale recognizes Defendants' inaction to date. Defense attorneys and prisoners have reported a continuing lack of hygiene protocols and social distancing, and corrections officers are suing for hazard pay.[28]

10.      Absent intervention from this Court to align the operation of Oakdale with public health principles—first and foremost, the release of as many incarcerated persons as possible, but also improved sanitation, testing, and treatment protocols for all others—devastating, and in many cases deadly, irreparable harm will befall incarcerated persons, facility staff, and the community.[29] The outbreaks in corrections facilities around the country[30] prove the need for immediate and significant reductions in population. The case-by-case review that Attorney General Barr proposes—even if implemented now, which it has not been—is no match for exponential spread

---

[27] *Id.*; *see also* Memorandum from Attorney General William Barr to Director of Bureau of Prisons, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (March 26, 2020), *available at* https://www.justice.gov/file/1262731/download.

[28] Nicole Ogrysko, *AFGE sues for hazard pay for federal employees working through coronavirus pandemic*, FEDERAL NEWS NETWORK (March 30, 2020, 6:26 p.m.) ("Three of the named plaintiffs on the case work at the Federal Correctional Complex in Oakdale, Louisiana."), *available at* https://federalnewsnetwork.com/afge/2020/03/afge-sues-for-hazard-pay-for-federal-employees-working-through-coronavirus-pandemic/.

[29] Noam N. Levey, Jenny Jarvie, *Coronavirus Will Hit Health System Hard and Not All States are Prepared*, L.A. TIMES (March 12, 2020 4:00 a.m.), https://cutt.ly/mtYTI3U; Joanne Kenen, *Local Officials Alarmed by Dearth of Ventilators, Hospital Beds*, POLITICO (March 14, 2020 7:00 a.m.), https://cutt.ly/stYTDDk.

[30] Sam Kelly, *134 inmates at Cook County Jail confirmed positive for COVID-19*, CHICAGO SUN-TIMES (Mar. 30, 2020, 8:11 p.m.). https://cutt.ly/6tYTqi5.

of the disease. Courts and executive branch officials elsewhere in the country have accepted this reality and begun broad-based, categorical releases.[31]

11.     Accordingly, Petitioners—a class and subclass of persons incarcerated at Oakdale now and in the future—bring this action and request immediate release of all Petitioners and Class Members, coupled with appropriate support and conditions upon release, as informed by public health expertise.  If this Court does not grant immediate release on the basis of this Petition-Complaint, Petitioners request a hearing as soon as possible. Given the exponential spread of COVID-19, there is no time to spare.

## I.     JURISDICTION AND VENUE

12.     Petitioners bring this putative class action pursuant to 22 U.S.C. § 2241 for relief from detention that violates their Eighth Amendment rights under the U.S. Constitution.

13.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), and 28 U.S.C. § 1331 (federal question jurisdiction).

14.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because the Petitioners and all other class members are in custody in this judicial district and venue. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Petitioners' claims occurred in this district.

---

[31] *See, e.g.*, Memorandum and Order, *Thakker v. Doll*, No. 1:20-CV-0480 (M.D.Pa. Mar. 31, 2020) at Doc. No. 47 (categorically releasing petitioners who "suffer[] from chronic medical conditions and face[] an imminent risk of death or serious injury if exposed to COVID-19); Emmanuel Felton, *A Judge Ordered The Release Of Low-Level Prisoners Because Of The Coronavirus. People Were Absolutely Furious.*, BUZZFEED NEWS (Mar. 27, 2020, 5:27 pm), https://cutt.ly/QtD2DOl.

## II.     PARTIES

15.     Petitioner Brandon Livas, BOP No. Register 37736034, is detained in the satellite camp at Oakdale (FCI Oakdale II). He is 35 years old. He is diabetic and suffers from acute pancreatitis. He has no access to hot water and soap, and he cannot practice social distancing—he lives in a dorm-style barracks with a bed that is less than three feet away from his nearest neighbor. As part of his job duties at Oakdale, he is expected to clean about six prison offices. He is serving a 15-month sentence for fraud that began on December 2, 2019. He is a first-time, nonviolent offender.

16.     Petitioner Richard Joseph Buswell, BOP Register No. 15618035, is detained at Oakdale (FCI Oakdale II). He is 51 years old. He has access to communal bars of soap that are filthy; they are shared by about 125 people at four sinks; those 125 people share six showers and eight filthy toilets. He suffers from asthma, hypertension, and sleep apnea; he sleeps with a CPAP device. He is serving a 10-year sentence for conspiracy to commit securities fraud and an 8-year concurrent sentence for distribution of synthetic marijuana.

17.     Petitioner Johnny Smith, BOP Register No. 33172034, is detained at Oakdale (FCI Oakdale I). He is 49 years old and suffers from hypertension and a thyroid condition.

18.     Petitioner Carlos Lorenzo Martin, BOP Register No. 15029043, is detained at Oakdale (FCI Oakdale II). He is 35 years old and has compromised lungs due to childhood asthma. He is housed in a room which sleeps 72 prisoners in bunks arranged in rows, such that when he sleeps he can reach out and touch the person next to him on either side. He was convicted of a drug charge and is slated for release in eight months.

19.     Petitioner Dewayne Corbett, BOP Register No. 21703171, is detained at Oakdale (FCI Oakdale I). He is 58 years old and in chronic care. He has a respiratory disorder involving a

4-by-5-millimeter nodule on his lung and is awaiting a CT scan, so he feels he needs to socially distance but cannot.

20.    Petitioner Gaines Andrews, BOP No. Register 44677379, is detained in the satellite camp at Oakdale (FCI Oakdale II). He is 39 years old and suffers from asthma. He is the head of maintenance and frequently makes deliveries to FCI Oakdale I. As part of his job duties at Oakdale, he is helping construct tent camps in the prison recreation yard along with bunk houses and showers for prison staff. He pleaded guilty to a single count of conspiracy to distribute methamphetamine and received a 10-year sentence; he is scheduled for release on October 28, 2022.

21.    Respondent Rodney Myers is the warden of Oakdale and currently has immediate custody over Petitioners and all other putative Class members.

22.    Respondent Michael Carvajal is the Director of the United States Bureau of Prisons and is responsible for all people including Plaintiffs housed at Bureau of Prisons facilities, including all structures at Oakdale.

### III.        FACTUAL ALLEGATIONS

#### A.  COVID-19 Poses a Significant Risk of Illness, Injury, or Death

23.    The novel coronavirus that causes COVID-19 has led to a global pandemic.[32] As of April 5, 2020, there were more than 1.26 million reported COVID-19 cases throughout the world

---

[32] Goldenson Dec. ¶5; Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.

and more than 9,400 deaths in the United States.[33] Projections indicate that as many as 240,000 people in the U.S. will die from COVID-19, accounting for existing interventions.[34]

24.     The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[35] There is no vaccine against COVID-19, and there is no known medication to prevent or treat infection.[36] Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading the illness[37]—plus a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, are the only known effective measures for protecting against transmission of COVID-19.[38] Because the coronavirus spreads among people who do not show symptoms, staying away from people is the best way to prevent contraction.  In other words, *everyone*—including officials at Oakdale—has to act as is if *everyone* has the disease.

25.     Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs including the heart and liver.[39]

---

[33] *See* Johns Hopkins University of Medicine, *Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering at Johns Hopkins University*, https://cutt.ly/StEyn2U.
[34] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, WASH. POST. (April 1, 2020, 12:02 a.m.), https://cutt.ly/5tYT7uo.
[35] Centers for Disease Control and Prevention, *Interim Infection Prevention and Control Recommendations for Patience with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, https://cutt.ly/ztRAo0X.
[36] *Supra* note 3.
[37] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.
[38] Goldenson Dec. ¶14.
[39] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl.

26.     People over the age of fifty face a greater risk of serious illness or death from COVID-19.[40] In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%. 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[41]

27.     People of any age who suffer from the following also have an elevated risk: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease.[42] Early reports estimate that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[43]

---

[40] Xianxian Zhao, et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis (March 20, 2020), https://cutt.ly/etRAkmt.

[41] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report and Chinese CCDC report published in the Chinese Journal of Epidemiology).

[42] Centers for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://bit.ly/3dYDrqI; *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, World Health Organization, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[43] *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 28, 2020), at 12 https://cutt.ly/KtD3ALr (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

28.     In many people, COVID-19 causes fever, cough, and shortness of breath. However, for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe.[44] Most people in higher-risk categories who develop serious illness will need advanced support. This requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive care physicians.[45]

29.     In serious cases, COVID-19 causes acute respiratory disease syndrome ("ARDS"), which is life-threatening; those who receive ideal medical care with ARDS have a 30% mortality rate.[46]

30.     These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[47]

31.     Even some younger and healthier people who contract COVID-19 may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[48]

32.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza.[49] According to recent estimates, the fatality

---

[44] Goldenson Dec. ¶¶ 7-9.
[45] Kevin McCoy and Katie Wedell, *'On-the-job emergency training': Hospitals may run low on staff to run ventilators for coronavirus patients*, USA TODAY (Mar. 27, 2020), *available at* https://bit.ly/2V7rLsS.
[46] Letter from Faculty at Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.
[47] CDC, *Interim Clinical Guidance*, *supra* note 39.
[48] Robin McKie, *Why do some young people die of coronavirus?*, The Guardian (April 5, 2020), *available at* https://bit.ly/2x5dghp.
[49] Goldenson Dec. ¶7.

rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[50]

**B.  All People in Oakdale Face Grave and Immediate Danger Due to COVID-19**

33.     Beyond the general public health concerns presented by the COVID-19 pandemic, persons incarcerated at Oakdale face a particularly acute threat of illness, permanent injury, and death.[51]

34.     Louisiana is experiencing some of the worst COVID-19 outbreaks in the world. As of April 3, 2020, Louisiana had 10,297 confirmed cases of COVID-19, with at least 370 deaths.[52] A study from the University of Louisiana at Lafayette reported that COVID-19 cases grew at 67.8%, the highest rate in the United States.[53]

35.     People in congregate environments, which are places where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19,[54] as already evidenced by the rapid spread of the virus in cruise ships[55] and nursing homes.[56] It is virtually impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social

---

[50] Betsy McKay, *Coronavirus vs. Flu Which Virus is Deadlier*, WALL ST. J. (Mar. 10, 2020, 12:49 PM), https://cutt.ly/itEmi8j.
[51] Goldenson Dec. ¶¶ 15-23.
[52] Goldenson Dec. ¶ 11. Louisiana cases nearly tripled from March 29 (3,553 confirmed cases) to April 3 (10,297 confirmed cases).  *See* Louisiana Department of Health, Office of Public Health, Louisiana Coronavirus (COVID-19) Information, *available at* http://ldh.la.gov/coronavirus.
[53] Daigle, *Coronavirus Cases Grew Faster in Louisiana Than Anywhere Else in the World*, *supra* note 9
[54] Goldenson Dec. ¶ 19.
[55] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." *COVID-19 and Cruise Ship Travel*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEQvT.
[56] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served. *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEITH.

distancing and hygiene required to mitigate the risk of transmission.[57] This is demonstrated by dramatic outbreaks in the Cook County Jail in Chicago[58] and Rikers Island in New York City, where the transmission rate for COVID-19 is estimated to be the highest in the world.[59] The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[60]

36.     Correctional settings further increase the risk of contracting COVID-19 due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and no possibility of staying at a distance from others.[61]

37.     Correctional facilities house large groups of people together, and move people in groups to eat, recreate, and engage in programming.[62] They frequently have insufficient medical care for the population even outside times of crisis.[63] Hot water, soap, and paper towels are often in limited supply. Incarcerated people, rather than professional cleaners, are responsible for cleaning the facilities[64] and often are not given appropriate supplies.

---

[57] Goldenson Dec. ¶ 26; *see also* KPLC News, *Death toll rising at Federal prison in Oakdale* (April 2, 2020, 9:32 p.m.) (Corrections union president admits: "It's unfortunate that the inmates are being kept in a close proximity, that's just the nature and physical layout of our institution. They sleep in cells right next to one another. I mean approximately three to four feet from one another.").

[58] *See supra* note 30.

[59] *Supra* note 23.

[60] *How Coronavirus Spreads*, Centers for Disease Control and Prevention, https://cutt.ly/jtEE9vG.

[61] Letter from Johns Hopkins Faculty, *supra* note 46.

[62] *See, e.g,* Nathalie Baptiste, *Correctional Facilities are the Perfect Incubators for the Coronavirus*, MOTHER JONES (March 6, 2020), https://cutt.ly/GtRSi3e.

[63] *See, e.g.,* Steve Coll, *The Jail Health-Care Crisis*, The New Yorker (Feb. 25, 2019), https://cutt.ly/ftERHNg.

[64] *See* Exhibit 3 (Declaration of Gaines Andrews) ¶3; *see, e.g.,* Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (April 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people); North Carolina Dept. of Corrections, *North Carolina Prison Inmates at Work*,

38.     Outbreaks of the flu regularly occur in prisons. During the H1N1 epidemic in 2009, jails and prisons dealt with a disproportionately high number of cases.[65]

39.     In addition to Dr. Joe Goldenson, whose declaration is attached here, public health experts including Dr. Gregg Gonsalves,[66] Ross MacDonald,[67] Dr. Marc Stern,[68] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[69] Homer Venters,[70] the faculty at Johns Hopkins schools of nursing, medicine, and public health,[71] and Josiah Rich[72] have all strongly cautioned that people booked into and held in correctional facilities are likely to face serious, even grave, harm due to the outbreak of COVID-19.

**C.  Existing Procedures and Protocols Will Not Be Sufficient to Ensure the Safety of Class Members or the General Public**

40.     Because of the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release

---

https://cutt.ly/jtERCbb (noting that cleaning the grounds and facilities is one of the jobs of incarcerated persons in North Carolina).

[65] The H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher. David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, PRISON LEGAL NEWS (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

[66] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (March 11, 2020), https://cutt.ly/BtRSxCF.

[67] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020, 11:29 a.m.), https://cutt.ly/ptRSnVo.

[68] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (March 5, 2020), https://cutt.ly/EtRSm4R.

[69] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HEALTH AFFAIRS (March 10, 2020), https://cutt.ly/QtRSYNA.

[70] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (March 12, 2020), https://cutt.ly/ptRSPnk.

[71] *See,* supra note 46.

[72] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, THE GUARDIAN (March 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

from custody of people most vulnerable to COVID-19.[73] Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a prison and the broader community.[74] Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[75]

41.     Internationally, governments and jail staff have recognized the threat posed by COVID-19 and released high numbers of detained persons. In Iran, for example, more than 85,000 people were released from jails to curb the spread of coronavirus.[76]

42.     Domestically, jail administrators in Cuyahoga County, Ohio;[77] Los Angeles, California;[78] San Francisco, California;[79] Jefferson County, Colorado;[80] and the State of New Jersey,[81] among others, have concluded that widespread jail release is a necessary and appropriate public health intervention.

---

[73] *See, e.g.*, Josiah Rich, Scott Allen, and Mavis Nimoh, *We must release prisoners to lessen the spread of coronavirus*, WASHINGTON POST (March 17, 2020), *available at* https://wapo.st/2JDVq7Y.

[74] *See generally* Goldenson Dec.; *id.* at ¶ 26 ("What's more, the infection in FCI Oakdale would not stay limited to the facility, but would worsen infection rates in the broader community.").

[75] *Id.*

[76] *US Jails Begin Releasing Prisoners to Stem COVID-19 Infections*, BBC News (March 19, 2020), https://cutt.ly/9tRDyb3 (noting Iran's release of over 85,000 prisoners in response to the virus).

[77] Scott Noll, *Cuyahoga County Jail Releases Hundreds of Low-Level Offenders to Prepare for Coronavirus Pandemic*, (March 20, 2020 6:04 p.m.), https://cutt.ly/CtRSHkZ.

[78] Alene Tchekmedyian, *More L.A. County Jail Inmates Released Over Fears of Coronavirus Outbreak*, L.A. Times, (March 19, 2020 6:55 p.m.), https://cutt.ly/ltRSCs6.

[79] Megan Cassidy, *Alameda County Releases 250 Jail Inmates Amid Coronavirus Concerns, SF to Release 26*, San Francisco Chronicle (March 20, 2020), https://cutt.ly/0tRSVmG.

[80] Jenna Carroll, *Inmates Being Released Early from JeffCo Detention Facility Amid Coronavirus Concerns*, KDVR Colorado (March 19, 2020 2:29 pm.), https://cutt.ly/UtRS8LE.

[81] Erin Vogt, *Here's NJ's Plan for Releasing Up to 1,000 Inmates as COVID-19 Spreads* (March 23, 2020), https://cutt.ly/QtRS53w.

43.     Notwithstanding Attorney General Barr's April 3 memorandum, which lacks specificity and oversight, immediate release of medically vulnerable Class members and a plan formulated by a public health expert remain necessary.[82]

44.     The April 3 Memo directed Defendant Carvajal to review all prisoners with COVID-19 risk factors who may be candidates for release to home confinement, starting with those at Oakdale and two other federal detention centers that have been hit the hardest by COVID-19 so far.  This step, while necessary, falls far short of what is necessary to protect the health, safety, and lives of Petitioners and to avoid further death and serious illness. The April 3 Memo directs Defendant Carvajal to implement the review process "immediately" and "immediately maximize appropriate transfers to home confinement," but it does not provide any concrete timelines or procedures for doing so. Critical decisions are left entirely to the discretion of BOP personnel, who have already demonstrated that they lack the expertise and resources to implement AG Barr's directives and otherwise deal with the COVID-19 outbreak at Oakdale. Further, there is no indication how many people incarcerated at Oakdale will be considered and approved for transfer to home confinement. The only appropriate response to this emergency is immediate intervention by the Court.

45.     Indeed, it is unclear whether Defendants can or will move with the required speed. Even before President Trump signed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Defendant Carvajal had the authority to release vulnerable prisoners in light of the pandemic. He did not. The CARES Act, signed March 27, 2020, then gave the Attorney General expanded power to immediately release prisoners on account of COVID-19, and Attorney

---

[82] *See* Public Health Expert Declarations, *supra* note 80.

General Barr sent a memorandum to Defendant Carvajal the day before "directing" Defendant Carvajal to "prioritize" home confinement for vulnerable populations. Defendant Carvajal did nothing. Indeed, government attorneys continued to oppose release in individual cases for Oakdale prisoners.[83] Prisoners have informed undersigned counsel they have either not been permitted to submit individual grievance requests, or have not received responses to requests for furloughs, personal protective equipment, and additional personal hygiene supplies.

46.     It has now been three days since Attorney General Barr's April 3 Memo "directing" Defendant Carvajal to "move with dispatch in using home confinement" for vulnerable prisoners. Defendants have not moved with dispatch. There is no evidence that prisoners have been released based on these immediate directives. The case-by-case review contemplated in the April 3 Memo is both unnecessary—Oakdale is already a low-security facility—and inadequate to the moment. In the time between Attorney General Barr's March 26 directive and today, five men at Oakdale have died waiting for the process to play out.

47.     Accordingly, expedited release to home confinement—with social distancing, testing, and other expert-guided measures as necessary—is needed not only to prevent irreparable harm to members of the medically-vulnerable subclass, but also to reduce the incarcerated population at Oakdale sufficiently to ensure proper social distancing to reduce transmission for all class members and the wider public.[84]

---

[83] *See, e.g.*, United States' Supplemental Opposition to Motion for Modification of Sentence, Stay of Sentence, and/or Imposition of Interim Sentence, *United States v. Harold Lee*, No. 12-CR-0320 (W.D.La. Apr. 3, 2020).

[84] *See* Public Health Expert Declarations, *supra* note 80. Further, in the prison context, the ABA urges that "Governmental authorities in all branches in a jurisdiction should take necessary steps to avoid crowding that… adversely affects the … protection of prisoners from harm, including the spread of disease." ABA Standard on Treatment of Prisoners 23-3.1(b).

48.     Oakdale poses a particularly high risk of transmission. The CDC recommendations described above are "impossible" at Oakdale.[85] As to social distancing, Petitioner Buswell said that phones two feet apart, as are the sinks. There eight working sinks, eight dirty toilets, and "five or six" working showers for approximately 125 men at the Camp facility where he lives.[86] He also said, "There is no liquid soap in the individual soap dispensers and we only have access to communal bar soap, which is filthy. We do not have access to hand sanitizer or clean hand towels. Laundry is done only twice a week."[87]

49.     Petitioner Buswell is over 50 and has several serious chronic health conditions including asthma and sleep apnea that make him particularly vulnerable to COVID-19.[88] He has interacted directly with three staffers who have tested positive.[89] Yet no one has responded to his administrative request for a furlough for over a week, and his case manager told him she was "too overwhelmed to deal with it and did not provide [him] any further guidance."[90]

50.     Petitioner Andrews is the head of maintenance amongst the prisoners and is helping to build "tent camps in the yard" including "personally buil[ding] frames to hold oxygen tanks."[91] Although corrections officers are "quitting or retiring" rather than work at FCI Oakdale I, he is working seven days a week."[92] He and his team "do not have enough personal protective

---

[85] Declaration of Somil Trivedi at Ex. 2 (Declaration of Richard Buswell) ("Buswell Dec.") ¶4; Goldenson Dec. ¶ 26.
[86] Buswell Dec. ¶4; *see also* Andrews Dec. ¶5 ("Despite knowing about it, the prison directed maintenance to rip out half of the showers because they wanted to install new ones.").
[87] *Id.* ¶5.
[88] Buswell Dec. ¶2; Goldenson Dec. ¶8 ("The case fatality rate varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.")
[89] Buswell Dec. ¶10.
[90] *Id.* ¶8.
[91] Andrews Dec. ¶3.
[92] *Id.* ¶3, ¶6.

equipment. We are able to get masks once per day if we ask, but they are not N95 masks."[93] Even worse, he believes that prison officials "knew about this virus in January" but still "directed the maintenance team to rip out half of the showers because they wanted to install new ones."[94] He said the official overseeing shower installation retired on April 5.[95]

51.     Counsel's conversations with other prisoners during the current lockdown confirm these horrific conditions. A prisoner in the "Camp" facility at Oakdale told counsel that bunks are three feet away from each other; there is no access to hot water or soap; and there are eight showers for over 130 prisoners with no indication of tiered showering to improve social distancing. Camp residents are among the most vulnerable and cannot socially distance because of the "barracks-style" housing. A prisoner at the FCI Oakdale I building reported access to hot water and soap, but not hand sanitizer; laundry only once per week; and eight toilets, 15 urinals, and 24 showers for all prisoners, again without an indication of procedures to ensure distancing.

52.     All available evidence indicates that Defendants have thus far disregarded the Attorney General's directives to release vulnerable prisoners with "dispatch" in order to reduce populations and better achieve social distancing for those who remain.

53.     Corrections officers suing Oakdale for hazard pay have made similar, harrowing complaints: one "performed work in close proximity to objects, surfaces, and/or individuals infected with COVID-19."[96] Another "transported an inmate infected with COVID-19" and was

---

[93] *Id.* ¶4.
[94] *Id.* ¶5.
[95] *Id.*
[96] Complaint, *Braswell v. United States of America*, Civil Action No. 20-cv-359C at ¶ 23 (Fed. Cl. March 27, 2020), *available at* https://www.classaction.org/media/braswell-et-al-v-the-united-states-of-america.pdf.

only given personal protective equipment "after he had spent a significant amount of time with the inmate."[97]

54.     The corrections union president has admitted that there is not sufficient personal protective equipment and that the layout of the prison makes social distancing physically impossible.[98]

55.     Given this track record, it defies reality that Oakdale could now miraculously implement AG Barr's directives on its own, in line with CDC guidelines[99] and with the combination of speed and care for human life that the moment requires.[100]

## IV.     CLASS ACTION ALLEGATIONS

56.     Petitioners bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

57.     Petitioners Livas, Smith, Martin, Andrews, Corbett, and Buswell each seek to represent a class of all current and future people in post-conviction custody at Oakdale ("Class"), including a subclass of persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Subclass").

58.     The "Medically-Vulnerable" Subclass is defined as all current and future persons incarcerated at Oakdale over the age of 50, as well as all current and future persons incarcerated

---

[97] *Id.*

[98] KPLC News, *Death toll rising at Federal prison in Oakdale* (April 2, 2020) (Corrections union president admits: "It's unfortunate that the inmates are being kept in a close proximity, that's just the nature and physical layout of our institution. They sleep in cells right next to one another. I mean approximately three to four feet from one another.").

[99] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[100] *Id.; see also* Goldenson Dec. ¶ 28.

at Oakdale of any age who experience: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease.

59.     Each Petitioner can represent the Class because each Petitioner is currently housed at Oakdale. Each Petitioner can also represent the Medically-Vulnerable Subclass because each Petitioner is over the age of 50 and/or suffers from one of the conditions listed in the definition of the Subclass above.

60.     This action has been brought and may properly be maintained as a class action under Federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

61.     Joinder is impracticable because (1) the classes are numerous; (2) the classes include future members, and (3) the class members are incarcerated, rendering their ability to institute individual lawsuits limited, particularly in light of the BOP's current 14-day lockdown and generally reduced legal visitation and court closures in the Western District of Louisiana instituted to address COVID-19 concerns.

62.     There are approximately 1,871 people in the proposed Class, and, on information and belief, approximately 748 people in the proposed Medically-Vulnerable Subclass.[101]

---

[101] *See* https://www.bop.gov/locations/institutions/oak/; https://www.bop.gov/locations/institutions/oad/.

63.     Common questions of law and fact exist as to all members of the proposed Class and Subclass: all have a right to receive adequate COVID-19 prevention, testing, and treatment.

64.     Named Petitioners have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Petitioners have no interests adverse to the interests of the proposed class. Petitioners retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation. Counsel for Petitioners know of no conflicts among proposed class members or between counsel and proposed class members.

65.     Defendants have acted on grounds generally applicable to all proposed Class members, and this action seeks declaratory and injunctive relief. Petitioners therefore seek class certification under Rule 23(b)(2).

66.     In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed classes.

## V.     ARGUMENT

### A. Petitioner's Incarceration Amidst the Current COVID-19 Outbreak in Oakdale Violates his/her Right to Constitutional Conditions of Confinement

67.     Corrections officials have a constitutional obligation to protect incarcerated people from a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Indeed, under the Eighth Amendment, prison officials "must provide humane conditions of confinement; . . . must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]" *Id.* at 832 (internal quotation marks omitted). This obligation also requires corrections officials to address prisoners' serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493,

531-32 (2011); *Hinojosa v. Livingston*, 807 F.3d 657, 666 (5th Cir. 2015) (plaintiff stated an Eighth Amendment claim when Defendants subjected him to conditions "posing a substantial risk of serious harm" to his health).

68.     This obligation requires corrections officials to protect incarcerated people from infectious diseases like COVID-19; officials may not wait until someone tests positive for the virus and an outbreak begins. *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("It is also important to note that [an] inmate need not show that death or serious illness has [already] occurred."); *see also Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."). By then it is too late. That one individual would have almost certainly infected untold numbers of people before displaying symptoms.[102]

69.     Prison officials violate this affirmative obligation by showing "deliberate indifference" to the substantial risk of serious harm. *Farmer*, 511 U.S. at 828. With respect to an impending infectious disease like COVID-19, deliberate indifference is satisfied when corrections officials "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling*, 509 U.S. at 33, 36 (holding that a prisoner "*states a cause of*

---

[102] Goldenson Dec. ¶ 26.

*action . . .* by alleging that [corrections officials] have, with deliberate indifference, exposed him to conditions that pose an unreasonable risk of serious damage to future health") (emphasis added); *see also Ball v. LeBlanc*, 792 F.3d 584, 594 (5th Cir. 2015) (court "may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious") (citing *Farmer*, 511 U.S. at 842); *Hinojosa*, 807 F.3d at 667 ("open and obvious nature" of dangerous prison conditions supported an inference of deliberate indifference); *Johnson v. Epps*, 499 F. App'x 583, 589-92 (5th Cir. 2012) (allegations that prisoner was exposed to "serious, communicable diseases" and that prison officials were aware of the risk and did nothing to prevent it were sufficient to state a claim for violation of Eighth Amendment rights); *Gates v. Collier*, 501 F.2d 1291, 1300-03 (5th Cir. 1974) (affirming district court's holding that allowing "[s]ome inmates with serious contagious diseases . . . to mingle with the general prison population," alongside maintaining a host of other unsanitary and inhumane conditions, "constitute[d] cruel and unusual punishment") (cited with approval in *Rhodes v. Chapman*, 452 U.S. 337, 352 n.17 (1981)).

70.     Here, COVID-19 is "sure or very likely to cause serious illness," and even waiting until "next week" to attempt internal mitigation efforts may be too long. *See supra* ¶¶48-54 (describing Oakdale's failures to implement social distancing and hygienic practices thus far). In other words, the harmful "condition of confinement" at Oakdale is confinement itself.

71.     Indeed, as outlined in Dr. Goldenson's declaration, there are no mitigation efforts that Oakdale could undertake that would better prevent the risk of contraction—and possible later spread to the non-prison community—than immediate release of the Medically-Vulnerable Subclass and potentially more.[103] Accordingly, Oakdale's failure to do so constitutes deliberate

---

[103] Goldenson Dec. ¶ 26-27.

indifference. *See, e.g.*, *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("even where a State may not *want to* subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices.") (emphasis added).

72.     As Dr. Goldenson puts it:

> It is my opinion that the exponential infection of rate for COVID-19 we already see in the community would be magnified within FCI Oakdale. Adequate social distancing would be impossible to maintain. What's more, the infection in FCI Oakdale would not stay limited to the facility, but would worsen infection rates in the broader community. The death rate will increase substantially before it starts to diminish without major interventions. This is why leaving implementation in the hands of local officials alone, who lack the expertise and resources and were incapable of preventing the outbreak in the first place or treating those who eventually died, is insufficient.

Goldenson Dec. ¶ 26.

**B.  28 U.S.C. § 2241 is an Appropriate Vehicle to Remedy these Violations**

73.     Section 2241(c)(3) allows this court to order the release of inmates like Petitioners who are held "in violation of the Constitution." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself).

74.     While the Fifth Circuit has indicated that "conditions of confinement" claims may not sound in Section 2241, it has not addressed how Section 2241 would apply in the current context, where the "condition" is a lightning-fast pandemic that has *already killed five men in the*

*prison facility*. Therefore immediate release is the only medically and legally sound remedy, rather than mere mitigation and/or further proceedings.[104] *Cf. Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (preferring Section 1983 to Section 2241 where outcome of challenge is not inevitable) (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)); *see also Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (habeas "is not now and never has been a static, narrow, formalistic remedy"); Eve Brensike Primus, *A Structural Vision of Habeas Corpus*, 98 CAL. L. REV. 1, 12-14 (an original purpose of habeas was to rectify systemic violations by state actors).

## VI.      CLAIM FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution
28 U.S.C. § 2241
*Class including Medically-Vulnerable Subclass versus All Defendants*

75.      Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment. As part of the right, the government must protect incarcerated persons from a substantial risk of serious harm to their health and safety. *See, e.g., Farmer*, 511

---

[104] The Fifth Circuit recognizes that "[s]ection 2241 is the proper habeas remedy if a prisoner challenges the execution of his sentence rather than the validity of his conviction and sentence." *Carter v. Sawyer*, 54 Fed. App'x. 406 (5th Cir. 2002) (unpublished) (citing *United States v. Cleto*, 956 F.2d 83, 84 (5th Cir. 1992)); *see also United States v. Gabor*, 905 F.2d 76, 77-78 (5th Cir. 1990). Similarly, the Fifth Circuit has long held that the "sole function" of habeas is to "grant relief from unlawful imprisonment or custody," such as the unconstitutional imprisonment Petitioners are currently enduring. *United States v. Pierre*, 525 F.2d 933, 935-936 (5th Cir. 1976) (approving the district court's exercise of habeas jurisdiction to stay exclusion of petitioners because "[s]uch injunctive relief was necessary to enforce the petitioners' right of liberty, and inhered in the question of custodial restraint upon liberty" and the district court's decision not to exercise jurisdiction over petitioners' request for the issuance of work permits because "the collateral relief now sought, on the other hand, is extraneous rather than intrinsic to the central question of the legality of custody.") (emphasis added). *See also Torres v. Chapman*, 359 Fed. App'x. 459, 461 (5th Cir. 2009) (unpublished); *Moore v. King*, No. 08-60164, 2009 WL 122555, *1 (5th Cir. 2009) (per curiam) (unpublished) ("Because Moore does not seek release from custody, his claims are not cognizable in habeas proceeding.")

U.S. at 828; *Estelle*, 429 U.S. at 104.  Defendants are aware of the serious risk COVID-19 poses to members of the Class, and particularly members of the Medically-Vulnerable Subclass, yet have failed to take meaningful action to reduce the population of Oakdale and mitigate the risk of harm to the Class members. Defendants are therefore deliberately indifferent to that risk and violate Class members' constitutional rights.

76.     Oakdale has neither the capacity nor the ability to comply with public health guidelines to manage the outbreak of COVID-19 currently ravaging the facility and cannot provide for the safety of the Class.

77.     Defendants' actions and inactions result in the confinement of members of the Class in a prison where Defendants have not followed and seem incapable of following public health guidance regarding social distancing and personal hygiene, and treating or preventing COVID-19 outbreaks and deaths, all of which violates Petitioners' rights to treatment and adequate medical care.

78.     By failing to implement controls necessary to contain the COVID-19 outbreak and stop preventable deaths at Oakdale, Defendants have violated the Eighth Amendment rights of the Class and particularly the Medically-Vulnerable Subclass.

## VII.     REQUEST FOR RELIEF

79.     Petitioners and Class Members respectfully request that the Court order the following:

1.     Certification of this Petition as a Class Action;

2.     A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to immediately release all

Medically-Vulnerable Subclass Members, with supports to ensure social distancing and other expert-recommended measures to prevent the spread of coronavirus;

3.  Following immediate release of all Medically-Vulnerable Subclass Members, a plan, to be immediately submitted to the Court and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

    i.  Specific mitigation efforts, in line with CDC guidelines, to prevent, to the degree possible, contraction of COVID-19 by all Class Members not immediately released;

    ii.  A housing and/or public support plan for any released Class or Subclass Members for whom testing confirms exposure to or infection with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

4.  All further action required to release Class Members outside the Medically-Vulnerable Subclass to ensure that all remaining persons are incarcerated in Oakdale under conditions consistent with CDC guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them;

5.  If immediate release is not granted on the basis of this Petition alone, then expedited review of the Petition, including oral argument, via telephonic or videoconference if necessary;

6.  A declaration that Oakdale's policies violate the Eighth Amendment right against cruel and unusual punishment with respect to the Class; and

7.  Any further relief this Court deems appropriate.

Dated: April 6, 2020

Respectfully submitted,

Katie Schwartzmann, La no. 30295
Bruce Hamilton, La no. 33170
ACLU-F of Louisiana
P.O. Box 56157
New Orleans, La 70156
(504) 522-0628
kschwartzmann@laaclu.org
bhamilton@laaclu.org

David Luger*
Hannah O. Koesterer*
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe St.
Chicago, IL 60661
david.luger@katten.com
hannah.koesterer@katten.com

Ryan J. Meyer*
KATTEN MUCHIN ROSENMAN LLP
2121 Pearl St., Ste. 1100
Dallas, TX 75201
ryan.meyer@katten.com
*pro hac vice applications forthcoming

/s/ Somil Trivedi
Somil Trivedi*
Jennifer Wedekind*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St., NW
Washington, DC 20005
*pro hac vice applications forthcoming

Andrea Woods*
Brandon Buskey*
Meredith Taylor Brown*
Gabriel Arkles*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Tel. (212) 549-2500
awoods@aclu.org
*pro hac vice applications forthcoming

*Attorneys for Petitioners*

30