UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | |
|---|---|
| **BRANDON LIVAS, ET AL.** | **CIVIL ACTION NO. 2:20-CV-00422** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **RODNEY MYERS, ET AL.** | **MAG. JUDGE KATHLEEN KAY** |

### RULING

Petitioners Brandon Livas, Richard Buswell, Dewayne Corbett, Johnny Smith, Carlos Martin, and Gaines Andrews have filed a Petition for Writ of *Habeas Corpus*, Injunctive, and Declaratory Relief against Respondents Rodney Myers ("Warden Myers"), Warden of Oakdale Federal Correctional Institutions, and Michael Carvajal ("Director Carvajal"), Federal Bureau of Prisons Director, in their official capacities, pursuant to 28 U.S.C. § 2241. Petitioners, acting on behalf of themselves and a prospective class and sub-class have since filed an Emergency Motion for Release of Vulnerable and Low-Risk Prisoners from Oakdale ("Emergency Motion") [Doc. No. 9].

On April 15, 2020, in addition to filing a memorandum in opposition to this Emergency Motion [Doc. No. 13], Respondents filed a Motion to Dismiss [Doc. No. 12]. Respondents move the Court to dismiss Petitioners' Petition for Writ of Habeas Corpus, Injunctive, and Declaratory Relief and Petitioners' Emergency Motion on two alternative bases: (1) lack of subject-matter jurisdiction and (2) failure to state a claim as a matter of law.

Because of the expedited nature of the relief sought by Petitioners, on April 16, 2020, the Court held a status conference with counsel. At that time, the Court ordered Petitioners to

respond to the first basis for the motion, subject-matter jurisdiction, no later than Monday, April 20, 2020.[1]  Respondents were ordered to file a reply by Tuesday, April 21, 2020.

For the following reasons, Respondents' Motion to Dismiss is GRANTED IN PART and DENIED IN PART AS MOOT.

I.  **BACKGROUND**

Three months ago, most people had never heard of COVID-19 or the coronavirus.  As of the date of this Ruling, however, it would be difficult to imagine any person in the United States—or indeed globally--who has not felt the effects of the global pandemic caused by the rapid spread of this previously unheard of virus.

COVID-19 is an infectious disease caused by this novel coronavirus.  The coronavirus outbreak, which began in Wuhan, China, and was first confirmed in December 2019, has expanded globally at an alarming rate. *See* https://www.nytimes.com/article/coronavirus-timeline.html (last visited 04/22/2020).  According to the Centers for Disease Control ("CDC"), the "wide range" of symptoms may include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell.  https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited 04/21/2020).

Most people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment.  In some cases, however, COVID-19 causes severe respiratory issues.  Because COVID-19 is a new disease, there is limited information regarding risk factors for severe disease.  At this

---

[1] "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001).

time, based on the available information and clinical expertise, the CDC has issued guidance that older adults, 65 years of age and older, and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19. The CDC cautions that persons with these underlying medical conditions, particularly if not well controlled, are at higher risk:

(1) chronic lung disease or moderate to severe asthma;

(2) serious heart conditions;

(3) the immunocompromised, which can be caused by many conditions, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications;

(4) severe obesity (body mass index of 40 or higher)

(5) diabetes;

(6) chronic kidney disease undergoing dialysis;

(7) liver disease.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited 04/21/2020).

Currently, there are no vaccines or proven, effective treatments for COVID-19. The virus spreads primarily through droplets of saliva or discharge from the nose when an infected person coughs or sneezes, although there is evidence that persons who are asymptomatic may infect others. To mitigate the spread of the disease, the CDC and other public health agencies have recommended social distancing, a requirement that persons remain at least six feet from each other, to employ good hygiene practices, and to avoid touching your eyes, nose, and mouth

with unwashed hands. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited 04/21/2020).

In the period between January 21, 2020, when the first COVID-19 case was officially diagnosed in the United States[2] and April 21, 2020, there have been 802,583 cases and 44,575 deaths.[3]   https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited 04/22/2020).

In Louisiana, as in many states, Governor John Bel Edwards has issued a stay-at-home order, in an effort to "flatten the curve," i.e., to prevent the number of cases from overwhelming the health care systems.  There have been 22,258 reported cases in Louisiana and 1,473 deaths.  http://ldh.la.gov/Coronavirus/ (last visited 04/22/2020).  Among those deaths are seven (7) prisoners who were housed at the Oakdale correctional facilities. https://www.kplctv.com/2020/04/16/seventh-inmate-oakdale-federal-prison-dies-coronavirus/.

## II.   FACTUAL ALLEGATIONS AND PROCEDURAL HISTORY

Petitioners, represented by attorneys for the American Civil Liberties Union ("ACLU"), filed the instant lawsuit on April 6, 2020.  [Doc. No. 1].  Petitioners seek to represent themselves and members of a class, comprised of persons presently and in the future residing at Federal

---

[2] https://abcnews.go.com/Health/timeline-coronavirus-started/story?id=69435165 (last visited 04/21/2020).

[3] As the CDC acknowledges, the exact number of COVID-19 illnesses, hospitalizations, and deaths are unknown, for a variety of reasons, including the fact that some persons have either been asymptomatic or had only mild illness, there are delays in reporting and testing, not everyone who is infected gets tested or seeks medical care, and there may be differences in how states and territories confirm numbers in their jurisdictions.  *Id.*

Correctional Institute ("FCI") Oakdale I and FCI Oakdale II, which includes the Camp (collectively "Oakdale").[4]

Petitioners assert that they "bring this putative class action pursuant to 28 U.S.C. § 2241 for relief from detention that violates their Eighth Amendment rights under the U.S. Constitution" and that the "Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1651 (All Writs Act), Article I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), and 28 U.S.C. § 1331 (federal question jurisdiction)." [Doc. No. 1, ¶¶ 12-13].

Petitioner Brandon Livas, BOP No. Register 37736034, is detained in the satellite camp at Oakdale (FCI Oakdale II). He alleges as follows:

> He is 35 years old. He is diabetic and suffers from acute pancreatitis. He has no access to hot water and soap, and he cannot practice social distancing—he lives in a dorm-style barracks with a bed that is less than three feet away from his nearest neighbor. As part of his job duties at Oakdale, he is expected to clean about six prison offices. He is serving a 15-month sentence for fraud that began on December 2, 2019. He is a first-time, nonviolent offender.

[Doc. No. 1, ¶ 15].

Petitioner Richard Joseph Buswell, BOP Register No. 15618035, is detained at Oakdale (FCI Oakdale II). He alleges as follows:

> He is 51 years old. He has access to communal bars of soap that are filthy; they are shared by about 125 people at four sinks; those 125 people share six showers and eight filthy toilets. He suffers from asthma, hypertension, and sleep apnea; he sleeps with a CPAP device. He is serving a 10-year sentence for conspiracy to commit securities fraud and an 8-year concurrent sentence for distribution of synthetic marijuana.

---

[4] FCI Oakdale I has a population of approximately 917. FCI Oakdale II has a population of approximately 900, including 760 at the prison and 140 at the camp. *See* https://www.bop.gov/locations/institutions/oak/; https://www.bop.gov/locations/institutions/oad/.

[Doc. No. 1, ¶ 16].

 Petitioner Johnny Smith, BOP Register No. 33172034, is detained at Oakdale (FCI Oakdale I). He alleges as follows:

> He is 49 years old and suffers from hypertension and a thyroid condition.

[Doc. No. 1, ¶ 17].

 Petitioner Carlos Lorenzo Martin, BOP Register No. 15029043, is detained at Oakdale (FCI Oakdale II). He alleges as follows:

> He is 35 years old and has compromised lungs due to childhood asthma. He is housed in a room which sleeps 72 prisoners in bunks arranged in rows, such that when he sleeps he can reach out and touch the person next to him on either side. He was convicted of a drug charge and is slated for release in eight months.

[Doc. No. 1, ¶ 18].

 Petitioner Dewayne Corbett, BOP Register No. 21703171, is detained at Oakdale (FCI Oakdale I). He alleges as follows:

> He is 58 years old and in chronic care. He has a respiratory disorder involving a 9 4-by-5-millimeter nodule on his lung and is awaiting a CT scan, so he feels he needs to socially distance but cannot.

[Doc. No. 1, ¶ 19].

 Petitioner Gaines Andrews, BOP No. Register 44677379, is detained in the satellite camp at Oakdale (FCI Oakdale II). He alleges as follows:

> He is 39 years old and suffers from asthma. He is the head of maintenance and frequently makes deliveries to FCI Oakdale I. As part of his job duties at Oakdale, he is helping construct tent camps in the prison recreation yard along with bunk houses and showers for prison staff. He pleaded guilty to a single count of conspiracy to distribute methamphetamine and received a 10-year sentence; he is scheduled for release on October 28, 2022.

[Doc. No. 1, ¶ 20].

Petitioners allege that all inmates at Oakdale face "a particularly acute threat of illness, permanent injury, and death." [Doc. No. 1, ¶ 33].  This is so because it is "virtually impossible for people who are confined in prisons, jails, and detention centers to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission." *Id.* at ¶ 35. Petitioners further allege that Respondents' action or inaction in failing to comply with public health guidelines of social distancing and personal hygiene, and treating or preventing outbreaks and deaths related to COVID-19 violate their right to treatment and adequate medical care, and therefore constitute cruel and unusual punishment. *Id.* at ¶¶ 75-77.

Accordingly, Petitioners "seek to represent a class of all current and future people in post-conviction custody at Oakdale ('Class'), including a subclass of persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ('Medically-Vulnerable Subclass')." [Doc. No. 1, ¶ 57]. Petitioners contend that the "'Medically-Vulnerable' Subclass is defined as all current and future persons incarcerated at Oakdale over the age of 50, as well as all current and future persons incarcerated at Oakdale of any age who experience: chronic lung disease or moderate to severe asthma; serious heart conditions; conditions that can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity (defined as a body mass index of 40 or higher); diabetes; chronic kidney disease or undergoing dialysis; or liver disease."[5] [Doc. No. 1, ¶ 58]. Petitioners contends that they can represent the class because they are "currently housed at

---

[5] Petitioners allege that there are approximately 748 inmates in the proposed Medically-Vulnerable Subclass.

Oakdale" and can represent the subclass "because each Petitioner is over the age of 50 and/or suffers from one of the conditions listed in the definition of the Subclass above." [Doc. No. 1, ¶ 59].

In their Request for Relief, Petitioners request that the Court order the following:

1. Certification of this Petition as a Class Action;

2. A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to immediately release all Medically-Vulnerable Subclass Members, with supports to ensure social distancing and other expert-recommended measures to prevent the spread of coronavirus;

3. Following immediate release of all Medically-Vulnerable Subclass Members, a plan, to be immediately submitted to the Court and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

   i. Specific mitigation efforts, in line with CDC guidelines, to prevent, to the degree possible, contraction of COVID-19 by all Class Members not immediately released;

   ii. A housing and/or public support plan for any released Class or Subclass Members for whom testing confirms exposure to or infection with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

4. All further action required to release Class Members outside the Medically-Vulnerable Subclass to ensure that all remaining persons are incarcerated in Oakdale under conditions consistent with CDC guidance to prevent the spread of COVID-19, including requiring that all persons be able to maintain six feet or more of space between them;

5. If immediate release is not granted on the basis of this Petition alone, then expedited review of the Petition, including oral argument, via telephonic or videoconference if necessary[6];

6. A declaration that Oakdale's policies violate the Eighth Amendment right against cruel and unusual punishment with respect to the Class; and

7. Any further relief this Court deems appropriate.

---

[6]To this extent, the Court has already undertaken expedited review.

[Doc. No. 1, ¶ 79].

Respondents move to dismiss the Complaint for lack of subject-matter jurisdiction. They argue that the Complaint should be dismissed as Petitioners have failed to establish a jurisdictional basis for the Court to hear this matter. They further argue that the Court is barred from reviewing Respondents' decisions regarding classification and placement of inmates. Further, Petitioners are unable to establish the court's jurisdiction under either the All Writs Act, the Suspension Clause, or the general federal question statute.

Petitioners respond that the Court has jurisdiction under 28 U.S.C. §2241, the proper vehicle for their claims, and that Respondents are not entitled to sovereign immunity.

The arguments on subject-matter jurisdiction are fully briefed.[7]

### III. LAW AND ANALYSIS

#### A. Standard of Review

"Federal courts must resolve questions of jurisdiction before proceeding to the merits." *Ashford v. United States*, 463 F. App'x 387, 391-92 (5th Cir. 2012) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *USPPS, Ltd. v. Avery Dennison Corp.*, 647 F.3d 274, 283 & n.6 (5th Cir. 2011), and *Jasper v. FEMA*, 414 F. App'x 649, 651 (5th Cir. 2011)). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking. This is the first principle of federal jurisdiction." *Stockman v. FEC*, 138 F.3d 144, 151 (5th Cir. 1998) (quotation and citation omitted). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff

---

[7] Although Respondents also argue that the Complaint fails to state a claim for relief, the Court has limited briefing to the jurisdiction question.

constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir. 2001)(citations omitted).

    **B. Jurisdiction**

Respondents make a facial attack on the sufficiency of the Petitioners' allegations to support subject-matter jurisdiction in this case. Thus, the Court accepts those allegations as true for purposes of this Ruling and considers whether jurisdiction exists.[8]

In their Complaint, Petitioners assert that this Court has subject-matter jurisdiction over their claims as a Petition for Writ of *Habeas Corpus*, pursuant to 28 U.S.C. § 2241; the All Writs Act, 28 U.S.C. § 1651; the Suspension Clause in Article I, § 9, cl. 2 of the United States Constitution; and 28 U.S.C. §1331, the general jurisdictional statute. Respondents have presented arguments as to why the Court lacks subject-matter jurisdiction under each of these bases. However, in their opposition memorandum, Petitioners concede that "the All Writs Act and Suspension Clause . . . do not independently grant this Court jurisdiction to hear Petitioners' claims."[9] [Doc. No. 19, p. 6 n.3]. Rather, Petitioners contends that the All Writs Act and the

---

[8]*See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) ("Our first consideration is the distinction between a "facial attack" and a "factual attack" upon the complaint under Fed. R. Civ. Proc. 12(b)(1). . . Simply stated, if the defense merely files a Rule 12(b)(1) motion, the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands. If a defendant makes a 'factual attack' upon the court's subject matter jurisdiction over the lawsuit, the defendant submits affidavits, testimony, or other evidentiary materials. In the latter case a plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction.). To be sure, the Court has required Respondents to provide updated information about the efforts taken at Oakdale to combat the spread of COVID-19, but such evidence is not necessary for this Ruling. No one disputes, indeed Attorney General Barr's memorandum is a concession, that COVID-19 has had serious affects at certain facilities, including Oakdale.

[9]While no detailed analysis is required given Petitioners' concession, it is clear on its fact that the All Writs Act, 28 U.S.C. § 1651(a), merely allows courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of

Suspension Clause work "alongside 28 U.S.C. §§ 1331 and 2241," to "describe the combination of statutory and Constitutional authority under which this Court may order the necessary relief." *Id.* Instead, Petitioners argue that the Court has jurisdiction under § 2241 and that sovereign immunity does not bar the Court from exercising authority in this case under § 1331.

Given these concessions, the focus of the parties' memoranda, and the expedited nature of these proceedings, the Court thus limits its analysis to these arguments.

### A. Petition for Writ of *Habeas Corpus*, 28 U.S.C. §2241

On the face of the Complaint, Petitioners allege that "the government must protect incarcerated persons from a substantial risk of serious harm to their health and safety." [Doc. No. 1, ¶75]. Petitioners further allege that "[t]he Fifth Circuit recognizes that '[s]ection 2241 is the proper habeas remedy if a prisoner challenges the execution of his sentence rather than the validity of his conviction and sentence.'" *Id.* at p. 27, n. 104 (citing *Carter v. Sawyer*, 54 Fed. App'x. 406 (5th Cir. 2002) (unpublished)) (other citations omitted). As part of their support for their § 2241 Petition, Petitioners also cite to Fifth Circuit case law providing that "'sole function' of habeas is to 'grant relief from unlawful imprisonment or custody.'" *Id.* (quoting *United States v. Pierre*, 525 F.2d 933, 935-936 (5th Cir. 1976)).

However, Respondents move for dismissal because the Court is jurisdictionally barred from reviewing the BOP's discretionary classification and placement of Petitioners under § 2241.

The BOP is charged with the care, custody, and control of incarcerated individuals,

---

law." The "All Writs Act does not confer jurisdiction on the federal courts." *See Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 33, 123 S. Ct. 366, 370 (2002). Likewise, no cause of action arises under the Suspension Clause itself.

but is not empowered to reduce or modify criminal sentences imposed by courts, or to unilaterally release inmates. Rather, only the original sentencing courts have the power to modify or reduce inmates' sentences. *See* 18 U.S.C. § 3582. Both the BOP and individual inmates have the authority to move the sentencing court for a sentence reduction or modification in certain circumstances, including compassionate release. 18 U.S.C. § 3582(c)(1)(A).

On the other hand, authority and discretion are placed in the BOP to determine where to confine inmates. *See* 18 U.S.C. § 3621. Both placement in a Residential Reentry Center ("RRC") (more commonly known as a halfway house) and on home confinement are within the BOP's discretion. *See* 18 U.S.C. § 3624(c); 18 U.S.C. § 3621(c) ("Such conditions may include a community correctional facility" and "[t]he authority under this subsection may be used to place a prisoner in home confinement."). Under Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act (H.R. 748), enacted on March 27, 2020, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, the Director of the BOP may lengthen the maximum amount of time for which he is authorized to place a prisoner in home confinement under the first sentence of 18 U.S.C. § 3624(c)(2).

Indeed, both before and after the passage of the CARES Act, the Attorney General exercised his authority and issued memoranda to the Director of the BOP addressing exactly these concerns. It is a matter of public record, that the BOP began preparing for the coronavirus in January 2020 by obtaining guidance from its Health Services Division regarding the disease, existing outbreaks, and best practices to mitigate transmission. *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. On March 26, 2020, the Attorney General issued a memorandum to the BOP directing, where

appropriate, that the BOP utilize home confinement "to protect the health and safety of BOP personnel and the people in our custody." [Doc. No. 8, Exhibit 2]. The Attorney General directed the BOP to "prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." *Id.* However, the Attorney General noted that many inmates would be safer in BOP facilities due to the controlled population and access to medical care. *Id.* The prioritization of home confinement was conditioned upon careful, individualized determinations made by BOP staff to include certain discretionary factors such as: (1) age and vulnerability to COVID-19; (2) facility security level; (3) prison conduct; (4) minimum PATTERN score; (5) demonstrated and verifiable re-entry plan to prevent recidivism and maximize public safety (lower risk of contracting COVID-19 upon release, than at BOP facility); and (6) crime of conviction and risk posed by the inmate to the community. *Id.*

Additionally, on April 3, 2020, after the passage of the CARES Act, the Attorney General made a finding of emergency conditions which are materially affecting the function of the BOP. [Doc. No. 8, Exhibit 3]. This finding allowed the Attorney General to expand the cohort of inmates who can be considered for home confinement. *Id.* Thus, all at-risk inmates could now be considered for home confinement, rather than just inmates who were previously eligible for transfer (inmates with 10 percent of prison term remaining or 6 months). *Id*. The Attorney General also recognized that indiscriminately releasing inmates, "would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses." *Id.* As of the date of this Ruling, the BOP has placed 1,440 inmates on home confinement. https://www.bop.gov/coronavirus/(last visited 04/22/2020).

As Respondents point out, decisions made by BOP (or any prison officials) "necessarily involve balancing limited prison resources with the overriding concern of institution security." [Doc. No. 12-1, p. 8]. *See* 18 U.S.C. § 3621(b) (Statutorily requiring the BOP to consider five factors: (1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement of the court that imposed the sentence...; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28). Thus classification and placement of inmates is committed to the discretion of the BOP and once that discretion is exercised, "a designation of a place of imprisonment under this subsection is not reviewable by any court." 18 U.S.C. § 3621(b). Absent a review of whether the BOP has exceeded its statutory authority, the ultimate outcome of that classification is beyond the purview of the court. *See, e.g., McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."); *United States v. Yates*, No. 15-40063-01-DDC, 2019 WL 1779773, at *4 (D. Kan. Apr. 23, 2019) ("[I]t is BOP—not the courts—who decides whether home detention is appropriate."); *United States v. Gould*, No. 7:05-CR-020-O, 2018 WL 3956941, at *1 (N.D. Tex. Jan. 17, 2018) ("[T]he BOP is in the best position to determine whether RRC/halfway house placement would be of benefit to [the defendant] and to society in general."); *Creager v. Chapman*, No. 4:09-cv-713, 2010 WL 1062610, at *3 (N.D. Tex. Mar. 22, 2010) (stating that "nothing in the Second Chance Act of 2007, or 18 U.S.C. § 3621(b) entitles . . . any prisoner to placement in a residential reentry center"); *see also, Fullenwiley v. Wiley*, 1999 WL 33504428, at *1 (N.D.N.Y Oct. 5, 1999) ("[D]iscretionary decisions by the BOP made pursuant to its authority under § 3621(b) are not subject to judicial review"); see also 18 U.S.C. § 3625.

Petitioners do not challenge their classification or initial placement at Oakdale, but still seek "release" under § 2241 because of the extraordinary conditions caused by COVID-19. They bring this action under § 2241, which is the proper vehicle for challenging "the fact or length of confinement." *Preiser v. Rodriquez*, 411 U.S. 475, 494 (1973). However, the "sole function" of habeas is to "grant relief from unlawful imprisonment or custody and it cannot be used properly for any other purpose." *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976). In this case, Petitioners do not and cannot contend that their imprisonment or custody itself is unlawful; they are all convicted of certain crimes, were properly sentenced to serve terms of imprisonment, and then were assigned by the BOP to serve those terms of imprisonment at Oakdale.

Citing to the Supreme Court decisions in *Preiser*, supra; *Bell v. Wolfish*, 441 U.S. 520, 527 (1979); and *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862–63 (2017), Petitioners assert that the "Supreme Court has left the door open to so-called 'conditions of confinement' challenges under the habeas regime." [Doc. No. 19, p. 9, n. 6]. However, the availability of habeas relief for challenges of conditions of confinement was not before any of the cited courts. *See Preiser*, 411 U.S. at 499-500 (In a case involving the release of a state prisoner by a federal district judge without requiring him to exhaust his administrative remedies, the Supreme Court stated in dicta: "When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal. . . . But we need not in this case explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under §1983. That question is not before us. What is involved here is the extent to which § 1983 is a permissible alternative to the traditional remedy of habeas corpus."); *Bell v. Wolfish*, 441 U.S. at 527 (In a case brought by pretrial detainees

challenging the constitutionality of numerous conditions of confinement and practices in a federally operated short-term custodial facility, the Supreme Court stated in dicta that "we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself.") (citing *Preiser*, 411 at 499-500); *Abbasi*, 137 S. Ct. at 1862 (In a Bivens action by alien detainees held on immigration violations in wake of the September 11, 2001 terrorist attacks, the Supreme Court stated in dicta that "we have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus.") (citing *Bell* 441 U.S. at 526, n. 6; *Preiser*, 411 U.S. at 499).

As recently noted by another court, these cases, "reveal neither a ringing endorsement nor an outright prohibition." *Money v. Pritzker*, ---F.Supp. 3d ---, Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660, at *9 (N.D. Ill. Apr. 10, 2020). Neither party nor this Court found a single precedential case in the Fifth Circuit interpreting this dicta and allowing conditions of confinement claims to be brought under § 2241.

Moreover, even if it is theoretically possible to bring conditions of confinement claims under § 2241 because petitioners seek "release" from confinement, such is not the case here.[10] In

---

[10]The Court has reviewed the decisions of two sister federal district courts. In *United States v. Brady*, 2020 WL 1865486, at *1 (M.D. Pa. Apr. 14, 2020), Brady, who is confined in Connecticut, filed a *pro se* motion for release to home confinement in his sentencing court in Pennsylvania. When the government responded to the complaint as a request for compassionate release, the court, acting *sua sponte*, and without briefing from the government, converted the motion to a petition under § 2241, relying on *Preiser*.

In another decision, *Wilson v. Williams*, Civil Action No. 4:20-cv-00794 (N.D. Ohio April 22, 2020), a federal district judge in the Northern District of Ohio certified the class of prisoners at the Federal Correctional Institute at Elkton, Ohio. Applying Sixth Circuit case law, that court determined that § 2241 is the proper vehicle for asserting this type of claim, acknowledging that claims of the prisoners, almost identical to those in this case, "evade easy classification."

actuality, Petitioners do not seek release from custody because they have, for example, overserved their sentence, but seek to force this Court to order BOP to assign them to home confinement or to some other lesser form of detention, without regard to the BOP's own classification process, because of the unique circumstances caused by the COVID-19 virus.[11] *See* [Petitioners' Emergency Motion, Doc. No. 9-1 n.3, ("The term 'release,' as used throughout this memorandum, refers to discharge of incarcerated persons from the physical confines of Oakdale, not necessarily release from custody. Release options may include, but are not limited to: release to parole or community supervision; transfer furlough (as to another facility, hospital, or halfway house); or non-transfer furlough, which could entail a released person's eventual return to Oakdale once the pandemic is over and the viral health threat is abated. Any releases would include requirements for testing, care, and social distancing, as informed by the Rule 706 expert that Petitioners have requested."). Such a designation and/or classification falls squarely within BOP's authority and outside the purview of this Court.[12] To rule otherwise would make this Court a de facto "super" warden of Oakdale.

---

This Court respectfully disagrees with those decisions.

[11] While not pertinent to this Ruling, the Court notes that the BOP has also undertaken a number of other demonstrable steps at Oakdale to improve hygiene and better protect inmates and staff who remain at the facilities. *See* [Doc. No. 13-2, affidavit of Dr. Richard Griffin, Oakdale Medical Director; Doc. No. 14 (detailing steps taken)].

[12] The Court is certainly aware and has considered cases cited by Petitioners in other jurisdictions where courts have permitted petitioners to seek habeas relief based upon COVID-19. *See Vazquez Barrera*, 2020 WL 1904497, at *3-4; *Malamv. Adducci*, Case No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020); *Money,* 2020 WL 1820660, at *8; *Mays v. Dart*, No. 20-cv-2134, 2020 WL 1812381, at *6 (N.D. Ill. Apr. 9, 2020); *Bent v. Barr*, No. 19-cv-6123, 2020 WL 1812850, at *2 (N.D. Cal. Apr. 9, 2020); *Coreas v. Bounds*, No. TDC-20-0780, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020); *Thakkar v. Doll*, No. 20-cv-480, 2020 WL 1671563, at *2 (M.D. Pa. Mar. 31, 2020); *Amaya-Cruzv. Adducci*, No. 1:20-cv-789, 2020 WL 1903123, at *2-3 (N.D. Ohio Apr. 18, 2020); *Fofana v. Albence*, No. 20-10869, 2020 WL

### B. Waiver of Sovereign Immunity under 28 U.S.C. §1331

Petitioners also assert that the Court has jurisdiction over this case pursuant to the general jurisdictional statute, 28 U.S.C. § 1331. However, Respondents further contend that the Court lacks subject-matter jurisdiction under § 1331 because the United States has not waived sovereign immunity.

Section 1331 is a general jurisdictional statute providing the district court with jurisdiction for "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. General jurisdictional statutes do not independently waive the Government's sovereign immunity. *Taylor v. United States*, 2008 WL 4218770, at *3-4 (5th Cir. 2008); *Beale v. Blount*, 461 F.2d 1133, 1138 (5th Cir. 1972); *Divine v. United States*, 328 F.2d 305 (5th Cir. 1964) (no waiver under 28 U.S.C. § 1343).

Having found that exercise of subject-matter jurisdiction is not otherwise proper in this matter, the Court cannot rely on the general jurisdictional statute to fill that void.

### C. Appropriateness of Dismissal at this Juncture

Finally, the Court is aware that under Federal Rule of Civil Procedure 15(a)(1)(A), Petitioners "may amend [their] pleading once as a matter of course within . . . 21 days after serving it." Both parties have cited to cases relating to the litigation of prison conditions under

---

1873307, at *6-12 (E.D.Mich. Apr. 15, 2020); *Jeferson V.G. v. Decker*, No. 20-cv-3644, 2020 WL 1873018, at *5 (D.N.J. Apr. 15, 2020); *Valenzuela Arias v. Decker*, No. 20-cv-2802, 2020 WL 1847986, at *2-10 (S.D.N.Y. Apr. 10, 2020); *Barbecho v. Decker*, No. 20-cv-2821,2020 WL 1876328, at *5, *9 (S.D.N.Y. Apr. 15, 2020); *see also* [Doc. No. 19, pp. 9-11 (collecting cases)].

However, eight of these cases involve immigration detainees and one involves pre-trial detainees, both categories of persons who are subject to a different review and for whom habeas relief has routinely been acknowledged as the appropriate vehicle for detainees to challenge their custody. *See Braden v. 30th Judicial Cir. Ct. of Kentucky*, 410 U.S. 484, 488 (1973); *Chin Yow v. U.S.*, 208 U.S. 8, 13 (1908); *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

Prison Litigation Reform Act ("PLRA"), 18 U.S.C. §3626. *See Brown v. Plata*, 563 U.S. 493 (2011) (addressing Eighth Amendment violations of prison conditions in California state prisons under the PLRA and its specific requirements, including a 3-judge panel); *see also Money, supra* (addressing the safety and well-being of state court prisoners housed by the Illinois Department of Corrections during the COVID-19 pandemic). However, to the extent that Petitioners would move to amend their Complaint to assert a claim for injunctive or other prospective relief under the PLRA,[13] such amendment would be futile where there are no factual allegations that Petitioners have exhausted their administrative remedies, nor have the other requirements for the "release" of prisoners been met. *See* 18 U.S.C. § 3626(a)(2)-(3).

### IV. CONCLUSION

For the foregoing reasons, Respondents' Motion to Dismiss is GRANTED IN PART and DENIED IN PART AS MOOT. To the extent that Respondents move to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, the motion is GRANTED, and Petitioners' Complaint is DISMISSED WITH PREJUDICE. To the extent that Respondents moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, the Court has not reached those arguments, and the motion is DENIED AS MOOT.

MONROE, LOUISIANA, this 22nd day of April, 2020.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE

---

[13] The PLRA defines "the term 'prison'" to include "any Federal . . . facility that incarcerates or detains . . . . adults accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law." 18 U.S.C. §3626(g)(5). The "term 'prospective relief' means all relief other than compensatory monetary damages[.]" *Id.* at § 3626(g)(6).